IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| FACTORY MUTUAL INSURANCE COMPANY, d/b/a MUTUAL BOILER Re, | ) ) ) | CASE NO. 8:09-CV-159 |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| NEBRASKA BEEF, INC. and SOUTH OMAHA INVESTORS PACK, L.L.C., | ) ) ) ) | |
| Defendants. | ) ) | |

---

**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

**and**

**DEFENDANTS' BRIEF IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT**

---

PREPARED & SUBMITTED BY:

William M. Lamson, Jr., #12374
Anne Marie O'Brien, #18271
Lamson, Dugan and Murray, LLP
10306 Regency Parkway Drive
Omaha, NE 68114
Telephone: (402) 397-7300
Telefax: (402) 397-7824
wlamson@ldmlaw.com
aobrien@ldmlaw.com
*ATTORNEYS FOR DEFENDANTS*

## INTRODUCTION

Plaintiff, Mutual Boiler Re (hereinafter "MBRe"), has brought this declaratory judgment action against its insureds, Nebraska Beef, Inc. and South Omaha Investors Pack, LLC (hereinafter collectively "NE Beef") asking the court to void coverage for three electrical losses that occurred in the summer of 2008. The total of these three losses amounts to over $4,000,000. NE Beef counterclaimed in its answer, alleging that MBRe breached its insurance contract and acted in bad faith. MBRe then moved the court for summary judgment recently on the bad faith claim. It argued that there is no evidence to support this allegation at trial.

NE Beef disagrees. This brief will not only demonstrate that there is sufficient evidence to prove that the insurance company acted in bad faith in refusing to settle this claim, but it will also demonstrate as a matter of law that coverage should be had here and summary judgment should be granted in favor of NE Beef instead. For these reasons, NE Beef has also moved for summary judgment on both its bad faith and breach of contract claims. A ruling on the issues here would dispose of this case as a whole.

This brief is structured to respond to MBRe's motion for summary judgment on bad faith first, in order to assist the Court in tracking the volley of arguments initiated by MBRe. It then addresses NE Beef's motion for summary judgment on the breach of contract action. The structure necessitates some repetition due to the overlap in both claims, but we felt it necessary in order to preserve the integrity of each claim and to give the Court a comprehensive overview of the law and facts. We begin with the uncontroverted facts driving these mutual motions.

## STATEMENT OF UNCONTROVERTED FACTS

1.      MBRe attached a Form 100-1 Ed. 1/06 to its Equipment Breakdown Insurance

Policy for NE Beef entitled Notice To Policyholders.  (Ex. 1, Plummer Examination Under Oath

("EUO"), 17:21-25, 18:1-12)  It was part of the whole policy package to insureds.  It shall be

referred to hereinafter as "Form 100-1."

2.      Form 100-1 states that it is a "Notice to Policyholders."  (Ex. 2, O'Brien Aff.,

Attachment A)  It has the MBRe logo prominently displayed in the middle of the page.  The

form says:

> **If you have a Claim, you should report it to your Agent/Broker**.  If you cannot
> get in touch with your Agent/Broker, you can contact us directly by phone at
> (800) 814-4458 extension 688 or 665, or by Fax at (610) 722-2683.

3.      On June 14, 2008, NE Beef suffered an electrical equipment breakdown.

(Answer, Filing No. 8)  Marvin Schreck ("Schreck") at NE Beef called the broker, Gene Moyer

("Moyer"), to report this loss on June 14, 2008.  (Ex. 3, Schreck EUO, 26:18-25, 27:1-23, 38:17-

20)  Phone logs show the call was sent and received.  (Ex. 3, Schreck EUO, 83:17-25, 84:1-24,

85:18-24, 92:20-25)  Both NE Beef and Moyer admit that notice was given within 72 hours to

the broker within the policy terms.  (Ex. 3, Schreck EUO, 42:12-25; Plaintiff's Brief, p. 8, Filing

No. 42)

4.      On June 17, 2008, NE Beef suffered a second electrical equipment breakdown.

Schreck at NE Beef again called the broker, Moyer, to report this second loss on June 17, 2008.

(Ex. 3, Schreck EUO, 26:18-25, 27:1-23, 38:17-20)  Phone logs show the call was sent and

received.  (Ex. 3, Schreck EUO, 83:17-25, 84:1-24, 85:18-24, 92:20-25)  Both NE Beef and

Moyer admit that notice was given within 72 hours to the broker within the policy terms.  (Ex. 3,

Schreck EUO, 42:12-25; Plaintiff's Brief, p. 8, Filing No. 42)

2

5.      On June 27, 2008, NE Beef suffered a third electrical equipment breakdown due to a lightening strike.  Schreck at NE Beef once again called the broker, Moyer, to report this loss on June 27, 2008.  (Ex. 3, Schreck EUO, 26:18-25, 27:1-23, 38:17-20)  Phone logs show the call was sent and received.  (Ex. 3, Schreck EUO, 83:17-25, 84:1-24, 85:18-24, 92:20-25)  Both NE Beef and Moyer admit that notice was given within 72 hours to the broker within the policy terms.  (Ex. 3, Schreck EUO, 42:12-25; Plaintiff's Brief, p. 8, Filing No. 42)  Zurich Insurance Company ("Zurich"), another insurer whose policy would cover losses by lightening or weather, did not receive notice on this loss until October or November of 2008.  (Ex. 6, Timmerman Aff., ¶ 8)

6.      On July 17, 2008, NE Beef suffered a fourth electrical equipment breakdown. Schreck at NE Beef once again called its broker, Moyer, to report this loss on July 17.  (Ex. 3, Schreck EUO, 26:18-25, 27:1-23, 38:17-20)  Phone logs show the call was sent and received. (Ex. 3, Schreck EUO, 83:17-25, 84:1-24, 85:18-24, 92:20-25)  Both NE Beef and Moyer admit that notice was given within 72 hours to the broker within the policy terms.  (Ex. 3, Schreck EUO, 42:12-25; Plaintiff's Brief, p. 8, Filing No. 42)

7.      NE Beef assumed that the broker submitted all four claims to MBRe.  It was not until late October of 2008 – some four months later – that the parties discovered that for unexplained reasons, MBRe and Zurich had not received notice of any of NE Beef's four 2008 summer losses.  (Ex. 4, Moyer EUO, 35:20-25, 36:1-25, 37-38:1-25)

8.      MBRe admits that NE Beef submitted the claims in a timely manner to its broker. (Plaintiff's Brief, p. 8, Filing No. 42)

9.      The broker admits that it appears that the claims did not reach the insurer.  (Ex. 4, Moyer EUO, 35:20-25, 36:1-25, 37-38:1-25)

10.     In this action, NE Beef is making claim for the three losses that occurred on June 14, June 17 and July 17, 2008.  The total amount of the three combined claims exceeds $4,200,000.  (Ex. 6, Timmerman Aff., ¶ 9)

11.     Zurich has paid for the loss that occurred on June 27, 2008.  (Ex. 6, Timmerman Aff., ¶ 8)  Zurich received notice of the June 27 loss at the same time that MBRe received notice of the three losses in June and July 2008.  (Ex. 6, Timmerman Aff., ¶ 8)

12.     Zurich is not a party to this lawsuit.  However its actions are relevant here because NE Beef suffered a loss on June 27, 2008 that was covered under the Zurich policy at about the exact same time as the losses that should be paid by MBRe.  (Ex. 7, Holtorff Aff., ¶ 3.3)  Zurich did not receive timely notice.  (Ex. 7, Holtorff Aff., ¶ 3.3)  Zurich did not reject coverage despite the same factual scenario as we find here with MBRe.  (Ex. 6, Timmerman Aff., ¶ 8)  Zurich has paid NE Beef's claim in the amount of $ 1,526,000.  (Ex. 6, Timmerman Aff., ¶ 8)

13.     MBRe sent an employee, a claims investigator named Thomas Pazdera ("Pazdera"), to NE Beef in November of 2008.  (Ex. 2, O'Brien Aff., Attachments B, C, and D; Ex. 6, Timmerman Aff., ¶ 2; Ex. 5, Hughes EUO, 27:2-17)  Pazdera told NE Beef that he was an engineer who understood electrical matters.  (Ex. 6, Timmerman Aff., ¶ 3)  Pazdera inspected the NE Beef plant.  (Ex. 2, O'Brien Aff., Attachments B, C, and D)  He had a list of questions with him that he read.  (Ex. 6, Timmerman Aff., ¶ 4)  He spent a day with NE Beef management asking his questions and looking at evidence.  (Ex. 6, Timmerman Aff., ¶¶ 2-5)  He issued a report on each of the three losses.  (Ex. 2, O'Brien Aff., Attachments B, C, and D)

14.     For the June 14, 2008 loss, Pazdera issued a report stating that, based upon his investigation, this loss should be covered under the policy.  This report was sent internally within MBRe in December of 2008.  (Ex. 2, O'Brien Aff., Attachment B)

4

15.    For the June 17, 2008 loss, Pazdera issued a report stating that, based upon his investigation, this loss should be covered under the policy.  This report was sent internally within MBRe in December of 2008.  (Ex. 2, O'Brien Aff., Attachment C)

16.    For the July 17, 2008 loss, Pazdera issued a report stating that, based upon his investigation, this loss should be covered under the policy.  This report was sent internally within MBRe in December of 2008.  (Ex. 2, O'Brien Aff., Attachment D)

17.    These reports are also pertinent here for what they did **not** say.  No where in any of these reports did MBRe's investigating engineer say that he was not able to ascertain what occurred at the time of the electrical breakdowns in order to reach a conclusion on coverage for any of these losses under the terms of its policy.  (Ex. 2, O'Brien Aff., Attachments B, C, and D) Therefore it is reasonable to infer that MBRe's determination of coverage in December of 2008 was based upon ample factual information.

18.    No where in any of these reports did MBRe state that it needed more evidence or research in the future in order to complete its investigation of these losses to determine coverage under its policy.  (Ex. 2, O'Brien Aff., Attachments B, C, and D)  Therefore it is reasonable to infer that MBRe was able to sufficiently complete its investigation in December of 2008 in order to make its determination that these three losses should be covered under the policy.

19.    No where in any of these reports did MBRe state that it was unable to find witnesses who could provide information about what occurred at the time of each of these three losses in order to determine coverage under its policy.  (Ex. 2, O'Brien Aff., Attachments B, C, and D)  Therefore it is reasonable to infer that MBRe was able to interview sufficient witnesses in order to make its determination that these three losses should be covered under the policy.

20.     Despite MBRe's decisions in December of 2008 that all three losses should be covered under the policy, it failed and/or refused to send this information to NE Beef.  (Ex. 6, Timmerman Aff., ¶ 7)

21.     At the time of its investigation, MBRe knew or should have known that it had distributed Form 100-1 to its policyholder, NE Beef, directing it to contact its broker in case of a loss.  (Ex. 8, MBRe Admissions, p. 9, ¶ 24)

22.     At the time of its December investigation, MBRe knew or should have known that NE Beef did indeed contact its broker on all three losses within 72 hours as specifically directed by the instructions in Form 100-1.  (Ex. 4, Moyer EUO, 39:22-25, 40:1-21)

23.     Instead, on or about January of 2009, to the best of our belief, MBRe hired the Yates law firm to begin taking EUOs of the principal witnesses at NE Beef and its broker to find out how those parties interpreted the notice clause in the contract.  Complete copies of all these EUOs are attached to NE Beef's index of evidence as Exhibits 1, 3, 4 and 5.

24.     During the EUOs, MBRe did not ask about Form 100-1 until NE Beef provided a copy to the insurer, showing that it had complied with the MBRe's notice provisions.  (Ex. 5, Hughes EUO, 20:6-25, 21-23:1-25)

25.     After the first EUO of Bill Hughes ("Hughes") in February of 2009, NE Beef produced phone records to MBRe to show that it had indeed made calls on the dates of all three losses to its broker within 72 hours of each occurrence as directed by Form 100-1.  (Ex. 3, Schreck EUO, 79:19-25, 80:1-25, 81:1-25, 82:1-23)

26.     Both Hughes and Schreck with NE Beef also testified under oath that they had followed the directions of Form 100-1 and had called their broker, Moyer, within 72 hours.  (Ex. 3, Schreck EUO, 26:18-25, 27:1-23, 38:17-20; Ex. 5, Hughes EUO, 24:1-25, 50:12-25, 51:1-4)

27.     Like the reports of Pazdera, these EUOs are more telling here for what they do not cover. A complete and thorough reading of each EUO demonstrates the true focus of these depositions. For example, MBRe did not ask for additional information on whether the three losses were covered by the indemnity terms of the policy. MBRe did not ask the witnesses in detail about the cause of the electrical losses. MBRe did not ask questions of NE Beef to determine if there might be factual evidence that was destroyed or fraud in submitting the claim. MBRe did not try to develop proof to show that it may have been materially prejudiced by the late notices. Instead, the overall focus of the EUOs was on what the broker and NE Beef thought the policy notice provision meant and whether either believed the broker was an agent for MBRe or NE Beef.

28.     On May 7, 2009, MBRe sent a letter to NE Beef denying coverage for all three losses due to late notice. This was almost five months after MBRe concluded, according to the Pazdera reports, that each loss was covered by the policy. On the same day it sent denial letters, MBRe filed this lawsuit against NE Beef. (Complaint, Filing No. 1)

29.     It was reasonable for an insured like NE Beef to understand that Form 100-1 was a part of MBRe's policy package and that it set forth MBRe's requirements for notice of losses. (Ex. 7, Holtorff Aff., ¶¶ 3.2-3.5) At the time NE Beef received the MBRe policy, Form 100-1 was right on the front of the policy. (Ex. 3, Schreck EUO, 18:5-25, 19:1-25) Schreck took Form 100-1 off of the policy and taped it to his office wall so that he knew exactly when and where to call in case of a loss. (Ex. 5, Hughes EUO, 20:12-20, 21:1-9, 23:1-25, 24:1-13)

30.     NE Beef did not provide late notice on any of the three claims. (Ex. 3, Schreck EUO, 26:18-25, 27:1-23, 38:17-20) It followed the express directions of Form 100-1. (Ex. 5, Hughes EUO, 24:17-25) In each of the three losses, it called its broker within 72 hours to report

the occurrences. (Ex. 5, Hughes EUO, 24:17-25)  This was a reasonable and justified interpretation of the policy.  (Ex. 7, Holtorff Aff., ¶¶ 3.2-3.5)

I.

GENERAL OVERVIEW OF BAD FAITH STANDARDS

**A.      Burden Of Proof On Bad Faith.**

In this state an implied covenant of good faith and fair dealing is present in every contract of insurance. *Ruwe v. Farmers Mutual United Ins. Co.,* 238 Neb. 67, 73, 469 N.W.2d 129, 134 (1991).  To prove that an insurer breached that covenant and acted in bad faith, the policyholder must come forth with proof on certain elements of its claim, showing:

> (1)      That there was no reasonable basis for denying the benefits of the insurance policy; and

> (2)      That the insurer knew of, or recklessly disregarded, the lack of a reasonable basis.

*Radecki v. Mutual of Omaha Ins. Co.*, 255 Neb. 224, 583 N.W.2d 320 (1998); *Bailey v. Farmers Union Co-Operative Ins. Co.,* 1 Neb. App. 408, 498 N.W.2d 591 (1992).  Overall, a plaintiff may prove both elements through expert testimony, although it is not always mandatory.  *Bailey v. Farmers Union Co-Operative Ins. Co.*, 1 Neb. App. 408, 422, 498 N.W.2d 591, 600 (1992); *Weiss v. United Fire & Casualty Co.,* 197 Wis. 2d 365, 380, 541 N.W.2d 753, 758 (1995).

**1.      Reasonable basis for denial standard.**

Other courts have refined these elements further.  For example, in *Ruwe v. Farmers Mutual United Ins. Co.,* 238 Neb. 67, 73, 469 N.W.2d 129, 134 (1991) the Supreme Court stated that the test on the first element is an "objective standard."  In order to decide summary judgment on this issue then, a court must ask itself "would a reasonable insurer under the circumstances have denied or delayed payment on the claim under the facts and circumstances(?)"  *Id.*  What would a reasonable insurer have done to fairly and neutrally evaluate this claim?  *Anderson v.*

8

*Continental Ins. Co.,* 85 Wis. 2d 675, 692, 271 N.W.2d 368, 377 (1978) cited as the applicable

standard by *Braesch v. Union Ins. Co.,* 237 Neb. 44, 464 N.W.2d 769 (1991)[1] and *Ruwe,* 238

Neb. at 74, 469 N.W.2d at 134.

### 2.       Reckless disregard standard.

As to the second element, proof of the insurer's reckless indifference to the facts or to the

law can be inferred and imputed from its actions. *Ruwe,* 238 Neb. at 74, 469 N.W.2d at 135; and

*LaRette v. American Medical Security, Inc.,* 270 Neb. 545, 556, 705 N.W.2d 41, 49-50 (2005).

This would include a situation where an insurer has unreasonably ignored an argument or fact

that favors coverage. *Weiss v. United Fire & Cas. Co.,* 197 Wis. 2d 365, 541 N.W.2d 753

(1995); *accord, Bailey v. Farmers Union Co-op Ins. Co.,* 1 Neb. App. 408, 498 N.W.2d 591

(1992). The inference is in the policyholder's favor, not the insured's favor. *Pennfield Oil Co. v.*

*American Feed Ind. Ins. Co.,* 2007 U.S. Dist. LEXIS 21456 (D. Neb. 2007). This is because

there is an implied agreement in every insurance contract that the insurance company will

exercise due care and good faith where the rights of its insured are concerned. *Olson v. Union*

*Fire Ins. Co.,* 174 Neb. 375, 379, 118 N.W.2d 318 (1962).

To determine if a plaintiff in a bad faith case has proven its second element, a court must

ask itself: is this coverage "fairly debatable or subject to a reasonable dispute . . .?" *Williams v.*

*Allstate Indem. Co.,* 266 Neb. 794, 799, 669 N.W.2d 455, 460 (2003). Has the insurer "used all

available means to assemble the facts and to determine the applicable law?" *Olson v. Union Fire*

*Ins. Co.,* 174 Neb. 375, 381, 118 N.W.2d 318, 322 (1962).

---

[1]    *Braesh* was overruled on other grounds by *Wortman by and through Wortman v. Unger,* 254 Neb. 544, 578
N.W.2d 413 (1998).

### 3.      Good faith requires considering NE Beef's interests.

Good faith requires the insurer to take into consideration the insured's interest as well as

its own when making decisions. *Pennfield,* slip op. at 18; *Abernethy v. Utica Mut. Ins. Co.,* 375

F.2d 565, 570 (4th Cir. N.C. 1967) citing the influence of Nebraska's *Olson* case*, supra.*[2]  "This

concession represents the prevailing modern view." *Id., citing* Keeton, *Liability Insurance and*

*Responsibility for Settlement, supra*, at pp. 1143-1148.  So, for instance, a flat refusal to consider

the policyholder's evidence or legal arguments can constitute bad faith. *Abernathy*, 314 F.2d at

570; *West Point Dairy Prod. v. Hartford Steam Boiler Ins. Co.,* 2004 U.S. Dist. LEXIS 2940 (D.

Neb. 2004)  This may especially be so when the nature of the relationship has turned adversarial

after a claim has been submitted. *See, e.g. Weitz Co. v. Lloyds of London,* 574 F.3d 885, 893 (8th

Cir. 2009).  Or for further example, bad faith can be inferred when an insured comes forth with

evidence that his insurance company failed to conduct a proper investigation or failed to properly

evaluate and review the claim. *Ruwe*, 238 Neb. at 74, 469 N.W.2d at 135.  Other insurer actions

can also amount to bad faith, such as "delays in settlement, false accusations, and so forth." *Id.*

### 4.      Good faith requires knowing and applying Nebraska law.

Part of an insurer's duty necessarily includes obtaining competent legal advice

concerning the claim. *Hadenfeldt v. State Farm Mut. Auto Ins. Co.,* 195 Neb. 578, 585, 239

N.W.2d 499, 503 (1976).  This responsibility tracks with the burden imposed upon all who

contract in this Nebraska.  The "law of this state is an inherent part of every contract . . . and it is

read into and becomes a part thereof." *Haakinson & Beaty Co. v. Inland Ins. Co.,* 216 Neb. 426,

430, 344 N.W.2d 454, 458 (1984).  Thus, an insurer can be liable for bad faith if he denies

coverage on a claim that would be or should be covered under Nebraska common law. *See, e.g.*

*Hartford Fire Ins. Co. v. Guide Corp.*, 2005 U.S. Dist. LEXIS 45760 (S.D. Ind. 2005)(insurer

---

[2]      *Abernathy* follows the same standards for bad faith as Nebraska, citing *Olson, supra,* as a seminal case setting
forth an insurer's duties toward its insured.

can be held in bad faith because it failed to prove it was prejudiced by late notice when it denied claim).

###### 5.     Good faith is measured at time of demand.

The factual information that was available to the insurance company at the time of plaintiff's demand is used as the basis for resolution of this issue.  *Radecki,* 583 N.W.2d at 326. What evidence was available at the time the insurer **did** receive notice in order for it to determine if there is coverage under the policy?  *Id.*  And the issue can be decided as a matter of law if a court reviews the evidence and finds that an insurer has not honored its obligations under the contract or conducted itself in a manner commensurate with the interests of its insured.  *West Point Dairy*, 2004 U.S. Dist. LEXIS 2940, slip op. at 7.

### II.

### NEBRASKA BEEF MEETS ITS BURDEN OF PROOF ON BAD FAITH AS A MATTER OF LAW

Now that we have established NE Beef's burden of proof, we can turn to the evidence to show that it has met each and every threshold.  An examination of the uncontroverted facts and reasonable inferences demonstrate that MBRe did not act in the best interests of its insured when denying the three losses that occurred in the summer of 2008 at its packing plant.  We begin with our proof on the first objective standard.

### A.     <u>MBRe Had No Reasonable Basis For Denying The Benefits Of The Insurance Policy</u>.

MBRe based its denial on one fact:  that it received late notice of the claims.  (Complaint, Filing No. 1)  To determine if this was reasonable, we must look to the policy and see if NE Beef complied with its terms.  The policy included a separate sheet on top called Form 100-1 Notice to Policyholders.  (Ex. 3, Schreck EUO, 18:5-25, 19:1-25)  MBRe's logo is prominently

displayed in the middle of that one page document. MBRe admits that it sent this form to NE

Beef as part of its 2008 policy. (Ex. 8, MBRe Admissions, ¶ 24, p. 9)

The policy states that an insured must provide notice within 72 hours. (Complaint, Filing

No. 1) Form 100-1 refines this requirement further by adding more specific directions. It states

that:

> **If you have a Claim, you should report it to your Agent/Broker**. If you cannot
> get in touch with your Agent/Broker, you can contact us directly by phone at
> (800) 814-4458 extension 688 or 665, or by Fax at (610) 722-2683.

(Ex. 2, O'Brien Aff., Attachment A, emphasis added)

### 1.    NE Beef provided timely notice.

The language of Form 100-1 is not disputed. It is unambiguous. It directs NE Beef to

call its broker or agent **first** in case of a loss, and only then as a second option, to call MBRe.

This direction imparts to the reader MBRe's preference that it not be contacted with claims

unless as a last resort. The word "broker" is used twice on Form 100-1. MBRe's inclusion of

brokers as a clearing house for its claims must be seen as an intentional act. As an insurer who

markets its product through both brokers and agents, we can infer that this corporation knew the

distinction between the two licenses, and yet still chose to direct its insureds to report losses to

both its appointed and non-appointed representatives. (Ex. 2, O'Brien Aff., Attachment E)

There is only one reasonable interpretation of these directions because the language is pointed

and specific: an insured can and must call its broker or its agent first and foremost to report a

loss. (Ex. 7, Holtorff Aff., ¶ 3.3)

Right after receiving the MBRe policy, the NE Beef employee charged with notification

of losses, Schreck, taped Form 100-1 to his wall. (Ex. 3, Schreck EUO, 18:5-25, 19:1-25; Ex. 5,

Hughes EUO, 20:12-20, 22:1-9, 23:1-25, 24:1-73) He did this so that he could see where and

who to call.  It can be inferred that he did not want to risk non-compliance of the policy terms.
(Ex. 3, Schreck EUO, 15:13-17, 18:5-12, 26:10-22; Ex. 5, Hughes EUO, 22:1-9, 24:17-25)

In the summer of 2008, NE Beef suffered three losses.  (Ex. 6, Timmerman Aff., ¶ 2)
After each one, a NE Beef employee called the broker to report the claim within 72 hours.
MBRe admits this fact in its motion for summary judgment here:

> First, **it appears undisputed that Defendants contacted their insurance broker
> in a timely manner** after each of the losses.  Exhibit D. at 31:6 – 33:6.

(Plaintiff's Brief, p. 8 (emphasis added))  All this uncontroverted evidence proves that NE Beef
provided timely notice of the three claims as directed by MBRe in Form 100-1.

### 2.        The receipt of notice by MBRe is not a condition for coverage.

Nonetheless, MBRe argues that it acted in good faith denying NE Beef's claims because
MBRe **received** notice of the three losses late.  This argument fails for two factual reasons.  One,
it ignores the language of Form 100-1 issued to policyholders.  The contract directs that the
insured must **provide** notice to its broker.  We can see by the express language that the
**provision** of notice is what triggers coverage, not the **receipt** of it by MBRe.  The fact that
MBRe did not timely **receive** the notice is irrelevant because this was not an explicit condition of
coverage in either the policy or Form 100-1.

Second, the argument completely ignores NE Beef's substantial performance of the
contract.  (Plaintiff's Brief, p. 8, Filing 42)  This is an important point for summary judgment on
our breach of contract cause, which we will discuss later in this brief.  But it is also very
important now on the bad faith claim because MBRe's failure to acknowledge NE Beef's
compliance with Form 100-1's terms shows why MBRe has no logical or reasonable basis for
denying NE Beef coverage.  The undisputed facts show that this insured followed the directions
provided to it by MBRe in its Form 100-1 and it did not breach the contract terms.  (Ex. 7,
Holtorff Aff., ¶¶ 3.2-3.5)  A reasonable insured, upon receiving Form 100-1 as a loose sheet

13

added to the front his policy, would believe that he needed to comply with these explicit instructions for notice. (Ex. 7, Holtorff Aff., ¶¶ 3.2-3.4) And a reasonable insurer, when evaluating these claims, would look at the terms of its policy and see that the insured had complied with its directions. (Ex. 7, Holtorff Aff., ¶¶ 3.2-3.5) In other words, MBRe may have **received** late notice, but NE Beef **provided** it timely as MBRe directed in its contract language.

B.   **MBRE Recklessly Disregarded The Contract Terms.**

As to its second element in its burden of proof on bad faith, the facts show a pattern of omission that can be seen as reckless. What has troubled NE Beef in this relationship with MBRe has been the insurer's focus on irrelevant facts **after** its December coverage conclusions in order to drum up any excuse to avoid a large indemnity claim. Beginning with its EUO investigations, the litigation in this case, and the summary judgment motion it has filed here, we can see a pattern in MBRe's actions to ignore Form 100-1 and NE Beef's compliance with it. These omissions, taken together, add up to demonstrate an adversarial sub-text in MBRe's whole narrative of events after December 2008.

For example, after MBRe found out about the losses in late October and early November of 2008, it sent an investigator, Pazdera, to spend a day at the plant in order to determine whether or not these losses were protected by the policy. (Ex. 6, Timmerman Aff., ¶¶ 2-5; Ex. 8 , MBRe Admissions, pp. 2-6) Pazdera was the eyes and the ears of MBRe to determine coverage. In his three reports, Pazdera concluded the losses were covered. (Ex. 8, MBRe Admissions, pp. 2-6, ¶¶ 1, 2, 3, 6, 7, 10, 11)

For the June 14, 2008 loss Pazdera concluded: "Based upon my visit, I believe coverage exists for this claim under the Mutual Boiler Re policy." (Ex. 2, O'Brien Aff., Attachment B; Ex. 8, MBRe Admissions, p. 3, ¶ 3)

For the June 17, 2008 loss Pazdera concluded: "Based upon my visit, I believe coverage exists for this claim under the Mutual Boiler Re policy." (Ex. 2, O'Brien Aff., Attachment C; Ex. 8, MBRe Admissions, p. 4, ¶ 7)

And for the July 17, 2008 loss Pazdera concluded: "Based upon the information gathered, it appears that coverage exists for this incident under the Mutual Boiler Re policy." (Ex. 2, O'Brien Aff., Attachment D; Ex. 8, MBRe Admissions, p. 5, ¶ 11)

These reports are equally relevant here for what they do not say. Nowhere in these reports does MBRe advise that it lacked satisfactory information to investigate or determine coverage on the claims. The MBRe reports also do not state that its investigator was unable to complete his job because witnesses were absent. Nor does the investigator complain that too much time had passed to see where the electrical malfunctions had occurred, or to determine whether the loss was covered under the terms of the policy. Since Pazdera presented himself to be experienced in the specific subject matter of loss and coverage - electrical - we can reasonably presume that he would know what was missing or what additional information he would have needed to reach his opinions. This silence proves a lack of prejudice here as a matter of law. So from Pazdera's reports, then, we can reasonably presume that MBRe was able to conduct an adequate and thorough investigation of each of these claims. *See, e.g. First Specialty Ins. Corp. v. Novapro Risk Solutions*, 468 F. Supp. 2d 1321, 1335 (D. Kan. 2007)(the ability to investigate and determine coverage is the key issue to determine prejudice on late notice, not the competency of the investigation that was undertaken). The three Pazdera reports, that were made contemporaneous to the time of his research, do not conclude otherwise.

MBRe did not share these reports with NE Beef, keeping its coverage conclusions hidden from its insured. (Ex. 6, Timmerman Aff., ¶ 7) Instead, after these December reports were received, MBRe turned its attention to the notice issue to determine whether it could deny

coverage for this reason instead.  (Ex. 5, Hughes EUO, 131:9-25, 132:1-25)  MBRe chose this route even though its investigator, Pazdera, did not indicate any material prejudice from his investigation six months after the losses.  Because so much money is at stake here, it can legally be inferred that the insurer was looking for any excuse at that time to deny the claims that its investigator had recommended be paid.  *See, e.g. Bailey,* 1 Neb. App. at 420, 498 N.W.2d at 600; *The Weitz Co. v. Lloyds of London*, 574 F.3d 885, 893 (8th Cir. 2009)(the motive of parties to deny coverage should be considered by a court in a bad faith case).

During this second investigation into the notice issue, there is no objective indication that MBRe took NE Beef's compliance with Form 100-1 into account at all.  It was NE Beef who brought Form 100-1 to the insurer's attention – not the other way around.  During MBRe's first interrogation of NE Beef in February of 2009, NE Beef's president, Bill Hughes, told MBRe that the policy it had put before him was not complete.  (Ex. 5, Hughes EUO, 20:10-25, 21:1-25, 26:1-18)  He testified that NE Beef had received another page as part of its policy – the Form 100-1 - in contravention to what the insurer brought to the deposition as an exhibit.  (Ex. 5, Hughes EUO, 20:6-25, 21:1-25, 22:1-25)  It was then produced by NE Beef and given to MBRe during the EUO of Hughes in order to explain how NE Beef had complied with the contract commands.  (Ex. 5, Hughes EUO, 21:8-24)  Hughes explained that his company followed its directions in notifying MBRe of the losses.

> Q.     (By Mr. Winkler, counsel for MBRe)  In addition to the 72 hour notice provision, did you notice anything else about what form the notice needs to take?
>
> A.     (By Mr. Hughes)  Just in what I've read, you mean?
>
> Q.     Or your knowledge, either way.
>
> A.     The form has always, as this paper says, call your broker.  Notify your -- if you have a claim, you should report it to your agent broker is the first step, and that's

> what we've always done.  That's been my experience that I'm always  -- Mr.
> Schreck is very – what do they call it – anal about – he's very meticulous, and so
> he's very almost as its happening, he's calling somebody, the broker.

Q.       When you just answered that last question, you referred to Exhibit 2 as what you
         would have looked at?

A.       That's correct.

(Ex. 8, Hughes EUO, 24:12-25, 25:1-4)  This testimony was ignored.

After concluding its "notice" investigation into the losses, on May 7, 2009 MBRe issued
letters to NE Beef denying coverage.  This was done on the same day that it filed this lawsuit
against its insured.  (Ex. 2, O'Brien Aff., Attachments F and G)  These simultaneous actions did
not give NE Beef an opportunity to address its side of the issue with the insurer by pointing to its
compliance with Form 100-1.

In its letters denying coverage, MBRe stated that the basis for rejection was its **receipt** of
late notice.  MBRe discarded NE Beef's compliance with the Form 100-1 contract terms.  (Ex. 2,
O'Brien Aff., Attachments F and G)  In fact, NE Beef's timely notice to the broker was not even
addressed in the letters of denial.  (Ex. 2, O'Brien Aff., Attachments F and G)  MBRe did not
explain why it was not considering its own contract directions to be binding, which the law finds
inexplicable.  The court in *The Weitz Co. v. Lloyds of London*, 574 F.3d 885, 890, n.3 (8th Cir.
2009) summed this point up best when addressing a notice provision in an insurer's policy:

> We decline the Insurers' invitation to ignore the Policies' plain language in order
> to avoid what they perceive to be and "absurd result."  If the Insurers believed
> their own policy language was absurd, then they should have drafted different
> language.  *See, e.g. Montgomery Ward & Co. v. Home Ins. Co.*, 324 Ill. App. 3d
> 441, 753 N.E.2d 999, 1004 (Ill. App. Ct. 2001)(**the insurer easily could have
> refused to have included this type of notice requirement in the policy because
> insurance carriers are certainly sophisticated enough and here sufficient
> bargaining power to protect their interests**).

*Id.* (emphasis added).

17

And again, MBRe did not attach this Form 100-1 notice document to the version of the policy it filed with its declaratory judgment lawsuit – implying that it was not part of the whole contract between the parties. (Complaint, Filing No. 1)  Nor is Form 100-1 addressed in the body of its declaratory judgment complaint. (Complaint, Filing No. 1)  Thus, the policy that MBRe attached to its lawsuit was incomplete in this Court's file until NE Beef added Form 100-1 as part of its answer and counterclaim. (Answer, Filing No. 8)

Finally in its motion for summary judgment, MBRe does not address Form 100-1 either. It did not mention these contract terms in its statement of uncontested facts and MBRe again did not include it as part of the policy that it references in its brief and motion or attach it as an exhibit in its index. MBRe continues to maintain its position, that because it received the notice late from the broker, it can legally deny these claims.

So in light of all this uncontroverted evidence, we turn to those bad faith questions that our Supreme Court has required a trial court to ask with regard to the first standard:  would a reasonable insurer under the circumstances have denied or delayed payment on the claim under the facts and circumstances(?) and what would a reasonable insurer have done to fairly and neutrally evaluate this claim?[3]  Because the proof is so definitive, the answers are clear here as a matter of law. We can see that NE Beef complied with the terms of notice as dictated by MBRe in Form 100-1. Whether or not MBRe **received** the notices is irrelevant under the contract clause that it created. Thus, its reliance on this argument is not only unreasonable, it is unwarranted under the law. It appears that the insurer has dispensed its decisions against this policyholder selectively; finding against coverage by looking only at the facts that would justify MBRe's denial.

---

[3]   *Anderson v. Continental Ins. Co.,* 85 Wis. 2d 675, 692, 271 N.W.2d 368, 377 (1978) *citing Braesch v. Union Ins. Co.,* 237 Neb. 44, 464 N.W.2d 769 (1991) and *Ruwe,* 238 Neb. at 74, 469 N.W.2d at 134.

### C.   MBRe's Actions Were Not In Accord With A Similar Insurer.

Reasonableness is an objective standard.  We can look then to what another insurance company would do in the same or similar circumstances in order to determine this element.  In this case, a second insurer, Zurich, also received late notice of an electrical loss that occurred at NE Beef near the same time period.  On June 27, 2008, a windstorm at NE Beef knocked out its power a third time that month.  (Ex. 6, Timmerman Aff., ¶ 8)  NE Beef reported this loss to the broker within 72 hours as directed by the MBRe policy.  (Ex. 3, Schreck EUO, 27:7-23; Ex. 6, Timmerman Aff., ¶ 8)  The Zurich property policy also covered this claim.  (Ex. 6, Timmerman Aff., ¶ 8)  Like before, the broker failed to forward the claim on to both Zurich and MBRe.  (Ex. 4, Moyer EUO, 71:1-11; Ex. 6, Timmerman Aff., ¶ 8)  Zurich later found out about the June loss at about the same time that MBRe did - end of October or early November 2008.  (Ex. 4, Moyer EUO, 71:1-25; Ex. 6, Timmerman Aff., ¶ 8)  Zurich investigated and adjusted the claim during the same time that MBRe was engaging in the same process at NE Beef.  Yet Zurich paid the claim, despite the late notice.  (Ex. 6, Timmerman Aff., ¶ 8)  So we have objective evidence here of what a reasonable insurer would do when receiving notice of a loss that had occurred some four months earlier - it would pay the claim.[4]  (Ex. 7, Holtorff Aff., ¶ 3.3)[5]

### D.   MBRe Ignored Nebraska Insurance Law On Policy Notice Provisions.

We can also use these same facts to answer the questions posed by the second element on NE Beef's burden of proof here:  whether coverage was fairly debatable.  When we do, we see

---

[4]   MBRe may argue that its policy terms are different from Zurich, therefore the two claims are not relevant.  This is also not true.  Zurich required immediate notice of a loss under its policy terms.  MBRe wanted notice within 72 hours.  The difference in time and language is minimal.  But the essence of the argument remains the same.  Both of these insurers found out four months late about NE Beef's electrical losses that happened around the same time period and, unlike MBRe, Zurich has paid its insured without waging an adversarial defense under a technical interpretation of its policy.  (Ex. 2, O'Brien Aff., Attachment H)

[5]   *Williams v. Allstate Indem. Co.*, 266 Neb. 794, 799, 669 N.W.2d 455, 460 (2003).  *Olson v. Union Fire Ins. Co.,* 174 Neb. 375, 381, 118 N.W.2d 318, 322 (1962).

that MBRe did not use all available means to assemble the facts and to determine the applicable law. Not only did it ignore its own policy language and the conclusion of its December investigation, but it also did not apprise itself of Nebraska law on interpreting its own notice provision. This too could be construed as bad faith. *See, e.g. Waldman v. Pediatric Services of America, Inc.,* 1999 U.S. Dist. LEXIS 6016 (E.D. Penn. 1999)(denying insurer's motion for summary judgment on bad faith claim due to late notice).

Even if the policy and Form 100-1 can be construed in a manner to contend that MBRe's receipt of late notice was a viable excuse for it to deny coverage, this is only half the legal story. The other half is that under the law of this state an insurer must prove actual prejudice from the delayed notice in order to deny coverage. *Herman Bros. v. Great West Cas. Co.,* 255 Neb. 88, 97, 582 N.W.2d 328, 334-35 (1998). This proof must be definitive. In other words, an insurer must come forth with evidence to show that if the policyholder had sent timely notice, the insurer would have discovered that the loss was not covered by the policy terms. *Dutton-Lainson Co. v. Continental Ins. Co.,* 271 Neb. 810, 828, 716 N.W.2d 87, 102 (2006). The mere passage of time from incident to insurer's knowledge is not enough to establish prejudice. *Herman Bros.,* 255 Neb. at 97, 582 N.W.2d at 334-35.

To determine prejudice here, the Court need look no further than MBRe's own investigation of the three NE Beef losses in December of 2008. Pazdera's research and inspection was conducted some six months after the June and July 2008 losses. The reports he issued in December found that each loss was covered. As set out earlier, those reports did **not** conclude that MBRe was unable to investigate the claims due to the passage of time. Thus, this is not a viable excuse for MBRe.

Had the reports denied coverage, a different inference could be made here.  But because they do resolve the issue of coverage, and because they were made after a full and complete investigation by MBRe's electrical inspector, it is legally reasonable to infer that late notice was not prejudicial.  Those reports should be taken at their face value as admissions by MBRe.  They show that this insurer was able to conduct a satisfactory examination of the facts at the time it received the late notice from its broker and it was still able to conclude that the losses were covered by the terms of the policy.  Thus any argument in opposition here by MBRe must be ignored in light of its tacit admissions.  *See Breeden v. Anesthesia West, P.C.*, 265 Neb. 356, 656 N.W.2d 913 (2003)(a party cannot create an issue of fact by contradicting an earlier statement to meet the exigencies of its case)

In all its dealings with NE Beef since the inception of these losses, MBRe has failed to address the applicable Nebraska law on notice.  This is pertinent because as an insurer writing policies in this state, it is bound by our laws which are considered part and parcel of any contract between parties here.  *Haakinson & Beaty Co. v. Inland Ins. Co.*, 216 Neb. 426, 344 N.W.2d 454, 458 (1984); *Bank v. Hartford Cas. Ins. Co.,* 2009 U.S. Dist. LEXIS 74686 (D. Neb. 2009).  Had MBRe consulted the case books, it would have seen that its late notice denial of coverage is not legitimate because it has no proof of actual prejudice here.  *See, e.g. Larette v. Am. Med. Sec., Inc.,* 270 Neb. 545, 556, 705 N.W.2d 41, 49 (2005)(insurer must show lawful basis for denial to survive bad faith claim).  Its intentional ignorance of the law adds another fact to the long list here of unjustifiable actions in denying this claim.  *See Waldman v. Pediatric Serv. of America, Inc.,*, 1999 U.S. Dist. LEXIS 6016 (E.D. Penn. 1999)(insurer's decision to deny claim on late notice without having proof of prejudice can be bad faith).  This omission shows that this insurer did not use all available means to assemble the facts and to determine the applicable law

21

before denying these claims.  It provides uncontroverted proof that coverage in this case was **not** fairly debatable.

### E.   <u>Case Law Supports NE Beef.</u>

Now that we can set forth the standards for bad faith, and laid out the facts supporting our burden of proof, we can also look to some analogous case law as enhanced authority for denying MBRe's motion.  The case of *Waldman v. Pediatric Services of America, Inc.,* 1999 U.S. Dist. LEXIS 6016 (E.D. Penn. 1999) is directly on point to our situation here.  Fireman's Fund denied Waldman's claim because she provided notice well after the period set forth in the policy. Waldman then sued for indemnity and bad faith.  Like MBRe here, Fireman's Fund there filed a motion for summary judgment.  It argued that it denied the claim in good faith because the plaintiff waited a year to notify the insurer - creating a valid reason to deny coverage for Waldman's failure to adhere to the policy conditions.  *Id.,* slip op. at 3.

Nonetheless, the court refused to grant summary judgment for the insurer.  *Id.*  It found that Fireman's Fund unreasonably denied the claim because it could not prove that it was prejudiced by the late notice.  Thus, while late notice might be a fact in the case, it was not a **viable** defense under the laws of that state.

> Under this standard, Fireman's Fund's decision to deny Plaintiff's claims due to late reporting cannot be construed as reasonable under section 8371's bad faith standard unless it can show that the late reporting caused it prejudice.  **Here, Fireman's Fund has pointed to no evidence that it was prejudiced by Plaintiff's alleged late reporting.**  Consequently, a genuine issue of material fact exists as to whether Fireman's Fund reasonably denied Plaintiff's claims due to late reporting.

*Id.*, slip op. at 3 (emphasis added).  The insurer's motion was denied and the matter sent to a jury to determine bad faith.

Closer to home, the case of *Bailey v. Farmers Union Coop. Ins. Co. of Neb.*, 1 Neb. App. 408, 498 N.W.2d 591 (1992) is also instructive.  There the plaintiff filed a claim for indemnity and bad faith against her insurer.  She lost her home when the basement collapsed during a renovation project.  *Id.,* 1 Neb. App. at 410, 498 N.W.2d at 594.  Shortly after the incident, the insurer hired an engineer to come and inspect the loss to determine whether or not it was due to a cause that would be covered by the policy.  *Id.*  The investigator found it was.  *Id.*  Like MBRe here, Farmers did not apprise the insured of this.  *Id.*, 1 Neb. App. at 412, 498 N.W.2d at 595.  It later denied indemnity based upon a technical interpretation of the policy, presumably in order to coerce the plaintiff into settling her claim for much less.  *Id.*, 1 Neb. App. at 412-13, 498 N.W.2d at 595-96.

The trial court found this change of position unjustified.  It relied upon expert testimony of Barb Morrison from the Nebraska Department of Insurance who stated that  she could not find a reasonable basis for denying this claim according to the policy terms noted by the insurer.  *Id.*, 1 Neb. App. at 470, 498 N.W.2d at 598  This was enough for the court to find as a matter of law that there was no reasonable basis for denial and the insurer was acting in bad faith.  *Id.*, 1 Neb. App. at 421, 498 N.W.2d at 600.

The holdings of both of these cases provide guidance here.  In *Waldman,* the court ruled that a denial can be considered bad faith if the insurer's reason is not legitimate under the law. Fireman's Fund may have had an argument under its policy that the insured gave it late notice, but it did not and could not show prejudice which is considered a requirement in that state just as it is in ours.  The court there read Pennsylvania law into that policy, and determined that an insurer who ignores the common law in its denial of coverage can act in bad faith.  And in *Bailey,* Farmers may have had a technical reason for denial there, but it was based upon a twisted reading of its own policy, one that failed to take into account a reasonable interpretation of the

policy for the insured.  So, as in both cases there, is the situation here with MBRe.  Its reliance upon receipt of late notice, instead of its actual policy language, is a technical twist to a straightforward direction that it drafted.  Like the insurer in *Bailey*, *supra*, MBRe has expressly contradicted its own conclusions on coverage.  MBRe should not be allowed to create a new interpretation of its policy as a technique to deny legitimate claims that it once found should be paid.

### III.

### PLAINTIFF'S ARGUMENTS ARE NOT SUPPORTED BY NEBRASKA LAW

Plaintiff argues for summary judgment by stating that there was a breakdown in communication between the broker and the insurer – which should be imputed to NE Beef.  He asserts that the broker was considered in this case to be an agent of NE Beef and not MBRe; therefore the failure of the broker to pass on notice rests with NE Beef alone.  This argument ignores both MBRe's own policy language, Nebraska law, and abiding principles of equity.

**A.**    **MBRe's Form 100-1 Controls.**

As discussed earlier, MBRe drafted the Form 100-1 directions and provided them to NE Beef with its policy.  The objective of the words it chose was specific:  A policyholder can provide notice to a broker.  If the insured did do this, then it complied with MBRe's written contract directions.  It did not breach the agreement between the parties which is the issue here in this case.  As such, the fact that the broker, which MBRe designated to receive that notice, failed to pass it on cannot be considered to be a valid defense to the policy.  Any assertion otherwise is irrelevant here and should be ignored.

**B.    The Broker's Role Is Not Relevant To Coverage.**

Furthermore, MBRe argues that the broker acted as an agent for NE Beef, and not MBRe, in accepting such notice.  It bases its arguments on the opinions of the broker as to whom he thinks he was representing when looking for insurance coverage.  (Plaintiff's Brief, pp. 9-10) Again, this argument is irrelevant to coverage under the contract and whether the insurer had a reasonable basis for denying such claims.  It matters not **who** the broker thinks **he** was representing.  He was not a party to this insurance contract and he did not draft the language directing that he can accept notice of loss for MBRe.  MBRe did.  For it now to assert that the broker was not acting on its behalf is illogical.  Why then did MBRe direct its insureds in Form 100-1 to send notice to the broker first – before the insureds tried to contact the company?  This argument against coverage is a red-herring and should also be ignored.

**C.    Receipt Of A Loss Is Not Relevant To Coverage.**

MBRe argues that notice to the broker is insufficient here because MBRe did not know about the losses until late October 2008, months after they occurred.  (Plaintiff's Brief, p. 10) This is just another verse of the same song.  MBRe's discordant note is that it did not receive NE Beef's notice on time, even though it was provided timely.  As before, this is both illogical and irrelevant.  It is not a question of whether notice was sufficient, or who the broker was acting for, but whether NE Beef substantially followed MBRe's directions.  The uncontroverted evidence shows only that NE Beef did.  Furthermore, this argument also ignores Nebraska law on notice provisions in policies as we have discussed earlier.

**D.    The Insurer's Knowledge At Time Of Notice Controls.**

Finally MBRe also argues that the Court must look at the knowledge MBRe had at the time it **denied** coverage.  (Plaintiff's Brief, p. 11)  This would have been in May of 2009, the same day it filed suit against its insured.  However, our research showed a different time is

25

applicable.  The determination as a matter of law as to whether a claim is fairly debatable "is

based on the information available to the insurance company at the time the demand is

presented." *Radecki v. Mutual of Omaha Ins. Co.*, 255 Neb. 224, 230, 583 N.W.2d 320, 326

(1988) (citations omitted).  When we look at that time here, we can see that MBRe received the

demand in November 2008 and sent Pazdera to investigate 30 days later.  And we know what

information MBRe had at or near that time because Pazdera tells us in his reports.  (Ex. 2,

O'Brien Aff., Attachments B, C, and D)  It was adequate to determine coverage.  Thus, it is both

illogical and unfair for MBRe now to argue that it did not have sufficient knowledge at the time

of notice to determine coverage when it admitted in its own reports that it did.

In any event, at whatever time controls here MBRe was also imputed with knowledge of

Nebraska law on notice.  *See LaRette, supra.*  It is apparent from all its actions here that MBRe

failed to take into account Nebraska's policy that notice is not considered a valid defense without

proof of prejudice.  This was not addressed in the denial letters, the declaratory judgment suit

against its insured, or even MBRe's motion or brief asking for summary judgment.  Had MBRe

considered this, as it was bound to do, it would have realized that its own investigation in

December of 2008 controlled.  *See, e.g. Radecki,* 255 Neb. at 227-28, 583 N.W.2d at 324.  It

would have understood that it was not possible to show prejudice at this late date because MBRe

had already concluded that the losses were covered at a time closer to the date of the occurrences

and after it had a chance to conduct a reasonable investigation.  *Id.*

**E.     The Sum Total Of MBRe's Omissions Show Recklessness.**

Since intent can be imputed to an insurer in a bad faith action, we must look at the

objective evidence to determine whether it acted recklessly in denying this claim.  This can be

shown by omission as well as commission.  *See Radecki, supra.*  All the evidence here meets NE

Beef's burden of proof. And it is uncontested. A very brief summary is necessary to show that not only is summary judgment unwarranted here for MBRe, it is justified for NE Beef.

First, MBRe investigates the three losses in December of 2008 and determines that they are covered. This is six months after the losses occurred. MBRe does not disclose these conclusions to NE Beef who was wondering about the claims. Then, MBRe decides to take depositions of key witnesses in February through March of 2009. Those depositions focus almost exclusively upon the parties' opinions on what the notice provision means in the insurance contract. They do not focus on the actual cause of the losses. Then in May of 2009, MBRe denied coverage for the three losses because it received late notice. On the same day MBRe sued NE Beef on its claims.

MBRe does not offer any evidence at any time showing that it may have suffered actual damage from the late notice. Nor can it, because it has already concluded that the losses were covered after an adequate investigation at the NE Beef plant site. MBRe ignores the Form 100-1 notice provision. For unexplained reasons, it does not regard its directions in that document to be binding. And it does not consider NE Beef's adherence to those directions to be justified. Instead, MBRe focuses exclusively upon the fact that it received notice late and this is an absolute defense to the policy. This position ignores Nebraska law interpreting such notice provisions in this state.

In sum, all this evidence points to an insurer with blinders on to its own policy provisions and Nebraska insurance law. From these facts we can reasonably impute this company's recklessness. We can do so by seeing a pattern in MBRe's unwillingness to deviate from its own script of how to avoid coverage on this large claim. We can do so by seeing MBRe's failure at all stages here to consider and disclose key facts or provisions of law that are in the interests of NE Beef, its insured. And we can do so by seeing MBRe's unwillingness to look at the express

terms of its own Form 100-1 and acknowledge that it was the insurer, not the insured, who wanted notice given to a broker in case of a loss. The refusal of the drafter to acknowledge its own directions is more than curious – it can only be seen as reckless – which is the burden of proof on a bad faith claim in Nebraska. *See, e.g. The Weitz Co.,* 574 F.3d at 590, n.3 (set forth here at p. 16)

## IV.

### NE BEEF HAS MET ITS BURDEN OF PROOF ON SUMMARY JUDGMENT AS A MATTER OF LAW

For all these reasons, NE Beef here requests that the Court not only deny MBRe's motion for summary judgment on the bad faith claim, but that it grants its own as a matter of law. Further discovery will not change the salient facts here. Nor will it change the admissions made by MBRe. Thus this Court has sufficient evidence before it to grant this motion now.

MBRe's actions in misdirecting the issues can only be seen as an intentional tactic. *See Weatherly v. Blue Cross/Blue Shield of Nebraska, Inc.,* 2 Neb. App. 669, 679, 513 N.W.2d 347 354, (Neb. App. 1994)(recklessness can be imputed to insured by actions or inactions of insurer). MBRe is intent upon driving a conclusion that there is no coverage in this case. After all, MBRe has taken an adversarial position by hiring counsel to conduct EUOs shortly after it determined that there was coverage, presumably in an attempt to determine that there was not. Why else conduct a "second" investigation?

MBRe's decision to "investigate" this claim after December of 2008 was not done in the insured's interests at all because a favorable concession to the insured was already reached. This, too, must also be seen as an intentional tactic to avoid coverage – otherwise why was it undertaken? MBRe had already decided by then that the claims should be covered. MBRe's intent to avoid coverage can reasonably be inferred here just as it was in *Bailey, supra,* and *Waldman, supra.*

We are certain MBRe will argue that it is entitled to defend itself in this regard, even if it later turns out it was wrong.  But that is not the situation in this case.  All the evidence points to a conscious disregard of salient facts and law that would weigh in favor of coverage – and an embrace of irrelevant facts and twisted logic that denies coverage.  In the end, what we are left with is an insurer who had a vested interest in only itself, not its insured as directed by law.  This is the essence of a bad faith claim.

WHEREFORE, for all these reasons, NE Beef respectfully requests that the Court deny MBRe's motion for summary judgment on bad faith, grant NE Beef's motion for summary judgment on bad faith, and for further relief as the Court deems just and proper.

---

### BRIEF IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT
### DECLARATORY JUDGMENT CLAIM

---

NE Beef also brings its own motion for summary judgment against MBRe on its declaratory judgment action, asking the Court to find that its three 2008 losses are covered under the contract between the parties.  Although this action is really at its inception and the parties have only conducted written discovery, there is sufficient evidence for the Court to find coverage as a matter of law.  The contract terms between the parties on how to provide notice are clear. NE Beef substantially complied with those terms.  And even if the Court finds that it did not, there is no evidence here showing that MBRe suffered any actual prejudice from late notice. This proof is essential in order to avoid its obligation to indemnify its insured.  For these reasons too, summary judgment is warranted here on the contract claim.

### 1.    NE BEEF DID NOT BREACH THE INSURANCE CONTRACT

We begin as we did before with an overview of Nebraska law.  In this state an insurance policy is a contract.  *Pennfield Oil Co. v. Am. Feed Indus. Ins. Co. Risk Retention Group, Inc.,*

2007 U.S. Dist. LEXIS 21456 (D. Neb. 2007) citing *Callahan v. Washington Nat. Ins. Co.,* 259 Neb. 145, 608 N.W.2d 592 (2000). The construction of it is purely a question of law for the court to decide. *Id., citing Union Ins. Co. v. Land and Sky, Inc.,* 247 Neb. 696, 529 N.W.2d 773 (1995). Courts must construe policies to give effect to the parties' intentions at the time the contract was made. *Katskee v. Blue Cross/Blue Shield of Neb.*, 245 Neb. 808, 813, 515 N.W.2d 645, 649 (1994). It will be interpreted in accordance with the reasonable expectations of the insured, and in case of doubt, the policy will be liberally construed in favor of the policyholder. *Hemenway v. MFA Life Ins. Co.,* 211 Neb. 193, 199, 318 N.W.2d 70, 74 (1982).

To ascertain the parties' intentions, the Court must first determine as a matter of law whether the policy clause at issue is ambiguous. *Katskee,* 245 Neb. at 813, 515 N.W.2d at 649. A policy is considered ambiguous when a word, phrase or provision in the contact has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Pennfield Oil,* slip op. at 3, *citing Poulton v. State Farm Fire and Cas. Companies,* 267 Neb. 569, 675 N.W.2d 665, 673 (2004). If a policy is ambiguous, a court can employ rules of construction and look beyond the language of the policy to ascertain the intention of the parties. *Katskee,* 245 Neb. at 813, 515 N.W.2d at 649.

But if the policy is not ambiguous, then the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them. *Id.* The Court should look to the policy language and prefer the "natural and obvious meaning of the provisions in a policy over a fanciful, curious, or hidden meaning." *Id.* An ambiguous policy will be construed against the insurance company that drafted the policy. And exclusionary clauses – such as those intended to prevent or deny coverage – will be liberally construed in favor of the insured. *Pennfield Oil,* slip op. at 19-20, *citing Modern Sound & Systems, Inc. v. Federated Mutual Ins. Co.,* 200 Neb. 46, 262 N.W.2d 183, 187 (1978).

### A.   Policy Form 100-1 Notice Is Not Ambiguous.

In this case, there are two notice provisions in the MBRe contract with NE Beef. The first is contained in the policy itself at page 8. (Complaint, Attachment A, p. 8, § VII, ¶ A, Filing No. 1) It requires an insured to provide notice within 72 hours of a loss to MBRe. The second provision is found in Form 100-1 where MBRe directs that notice can be provided to its broker. (Ex. 2, O'Brien Aff., Attachment A) The policy clause does not direct where to provide the notice, and Form 100-1 does. It is not ambiguous. All the terms found in Form 100-1 have plain and ordinary meanings. It can be seen as an exclusionary clause. It operates as conditions for payment of any losses, and indeed, MBRe has treated this clause as exclusionary in this case because it is resting its denial of coverage on notice here. As such under Nebraska law, the notice provision is then to be construed against the drafter – which is MBRe here. *Modern Sound, supra*, 262 N.W.2d at 187.

### B.   The Specificity Of Form 100-1 Overrides The General Policy Clause.

Further, a central tenet of contract law also applies to this case: that when general and specific terms in a contract relate to the same thing, the more specific provision controls. *Hans v. Lucas*, 270 Neb. 421, 424, 703 N.W.2d 880, 883 (2005); *Krzycki v. Genoa Nat. Bank*, 242 Neb. 819, 496 N.W.2d 916 (1993). Even though the contract clause cited by MBRe requires an insured to provide notice within 72 hours, the more specific provision is contained in Form 100-1, requiring that notice can be provided to a broker/agent or, if the broker/agent is unavailable, MBRe. Form 100-1 specifies to whom and how notice may be provided, even including a phone number to call. For this reason, it controls. *State v. Commercial Cas. Ins. Co.*, 125 Neb. 43, 49, 248 N.W. 807, 810 (1933)(where there are general and special provisions in a contract relating to the same thing, the special will control over the general provisions).

31

Both parties agree that NE Beef complied with Form 100-1.  There are also phone logs which independently document these actions.  (Ex. 3, Schreck EUO, 83:17-25, 84:1-24, 85:18-24, 92:20-25)  The evidence seems infallible, then, that NE Beef did not breach this insurance contract.  It substantially performed the conditions for coverage as directed by the insurer.  The three losses should be indemnified under the policy terms.  *Id.*, (stating that a party who fulfills the special contract provisions over the general ones has indeed fulfilled the contract terms).

C.   **MBRe Waived Its Policy Notice Provision When It Issued Form 100-2 To NE Beef**.

In addition, an insurance company in Nebraska can waive its contractual notice provision by making other representations to the insured.  *Dutton-Lainson Co. v. Continental Ins. Co.*, 271 Neb. 810, 829, 716 N.W.2d 87, 103 (2006).  This rule of law is also applicable here.  MBRe's issuance of Form 100-1 as a loose document along with the policy can be seen as a waiver of any other policy provision contained in the whole complex contract.  Its specificity controls.  So we can use this legal posit as another way to see that NE Beef complied with MBRe's written directions in Form 100-1.

We anticipate that MBRe will argue just the opposite; that NE Beef did **not** follow the policy terms because it did not submit its loss in writing, as required by the policy clause which controls.  This argument is a red herring.  First, as we have established, Form 100-1 did not require written notice and it controls under Nebraska law.  *Id.*  And second, if MBRe insists that the policy clause controls instead over Form 100-1, it has now created an ambiguity in the contract between the two provisions.  Any ambiguity needs to be resolved in favor of the insured, NE Beef.  *Pennfield,* slip op. at 3, *citing Modern Sound, supra,* 262 N.W.2d at 187.  Therefore MBRe's arguments favor NE Beef in the end.

**D.**    **The Insurer Believed Form 100-1 Controlled.**

The facts here track with the law too.  The insured reasonably understood from reading

Form 100-1 that it contained the primary directions for reporting a loss to MBRe.  (Ex. 3,

Schreck EUO, 18-19:1-25, 20:1-17; Ex. 5, Hughes EUO, 20:1-25, 21:1-20, 24:12-25)  The notice

was presented on a separate sheet of paper, along with the policy.  The reality that it was not

buried in the policy book meant that the insurance company wanted its insureds to be particularly

aware of its pertinence.  It was boldly captioned "Notice to Policyholders," like a warning note

of important declarations, summarizing all the necessary information on how to begin the claims

process.

Form 100-1 was printed with larger type than was used in the policy.  (Compare Ex. A to

Complaint (Filing No. 1) with Ex. 2, O'Brien Aff., Attachment A)  Either the typesetter made a

mistake, or MBRe wanted the reader's attention drawn to the contents by using larger letters to

capture the eye.  MBRe stamped its logo on it right in the middle of the page, as if there ought to

be no question that Form 100-1 belonged to the policy and was dictated by the insurance

company.  Form 100-1 was more detailed than the policy terms.  It told NE Beef who and how to

call – directing that the broker or agent should be contacted first.  **Only** if those representatives

were not available should the insured call MBRe.  This language explicitly placed the first line of

contact upon the broker.

MBRe has admitted that it intended Form 100-1 to be part and parcel of its entire contract

with NE Beef.  (Ex. 8, MBRe Admissions, p. 9, ¶ 24)  We can only presume then that MBRe

wanted NE Beef to follow these directions over and above those set out in the policy.  Otherwise

why would it have taken the effort to draft Form 100-1 and include it with the policy to NE

Beef?  Why is the presentation and style of Form 100-1 more prominent than the clause that

MBRe buried in its insurance plan?  Any ordinary and reasonable insured, and specifically this

33

one, believed upon reading Form 100-1 that it must contact the broker or agent in case of a loss. So it did.

**E.      NE Beef Expected Form 100-1 To Direct Its Action On A Loss.**

One of the measures of breach in Nebraska is to look at the expectations of the insured at the time it received the insurance contract. *Katskee*, 245 Neb. at 813, 515 N.W.2d at 649. We know in this case what NE Beef thought the notice requirements meant. Marvin Schreck at NE Beef took the loose, Form 100-1 from the policy package and taped it to his wall so that he would know who and how to call in order to report a loss. (Ex. 5, Hughes EUO, 20:12-25, 21:1-25, 22:1-18) The provisions of Form 100-1 remained there until the three losses in the summer of 2008. When each occurred he consulted the sheet, called his broker as directed by MBRe, and informed him of the occurrence in order to start the claims process. (Ex. 5, Hughes EUO, 26:18-25, 27:1-23, 38:17-20) These actions were reasonable and justified in light of how MBRe drafted Form 100-1 and packaged its policy. (Ex. 7, Holtorff Aff., pp. 4-5) Thus, there can be no breach of this contract when viewed in light of the insured's expectations, either.

**2.      MBRe CANNOT MEET ITS BURDEN OF PROOF**

**A.      MBRe Must Show Actual Prejudice To Prevail.**

In the alternative, if the Court reads the contract as requiring 72-hour written notice, and it determines that it was improper for NE Beef to give its notice to a broker in lieu of MBRe, MBRe still cannot prevail here. In order to succeed MBRe must show with actual evidence that the late notice caused it prejudice and harm. *Herman Bros. v. Great West Casualty Co.*, 255 Neb. 88, 582 N.W.2d 328, 334-35 (1998).

> (T)he function of a notice requirement is to protect the insurance company's interests from being prejudiced. Where the insurance company's interests have not been harmed by a late notice, even in the absence of extenuating circumstances to excuse the tardiness, the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance company of its obligations under the policy in such a situation.

*Employers' Liab. Assur. Corp. v. Hoechst Celanese Corp.*, 684 N.E.2d 600, 607 (Mass. App. Ct. 1997) (internal quotes and citations omitted). Without this evidence MBRe has not met its burden of proof. *Herman Bros. v. Great West Casualty Co.*, 255 Neb. 88, 582 N.W.2d 328, 334-35 (1998). Its claim against coverage must be denied. *Id.*

This is true whether the policyholder is sophisticated or unsophisticated. *Compangnie Des Bauxites de Guinea v. Insurance Co. of N. America*, 794 F.2d 871 (3d Cir. 1986)(whether the insured is an individual consumer or a large company having the ability to negotiate policy terms; thus, insurer was not relieved of obligation to pay claim on loss of production policy, though insurer did not receive notice of claim until two months after expiration of claim period in policy, absent showing of prejudice); *Aetna Cas. & Sur. Co. v. Dow Chemical Co.*, 10 F. Supp. 2d 800, 812 (E.D. Mich. 1998). Therefore the business acumen of NE Beef is irrelevant here.

Courts have grappled case by case with how prejudice can be shown. In general, what constitutes an insured's reasonable or timely notice to an insurer of an underlying claim is a question of fact for resolution by a jury. Appleman on Insurance § 3501. "(P)rejudice will be found where the delay 'materially' impairs an insurer's ability to contest its liability to an insured or the liability of the insured to a third party." *West Bay Exploration Co. v. AIG Specialty Agencies, Inc.*, 915 F.2d 1030, 1036 (6th Cir. Mich. 1990). However there are some states that have granted summary judgment on the issue, so it is not always a jury question if the facts are uncontroverted. *See, e.g. Cooperative Fire Ins. Assoc. of Vermont v. White Caps, Inc., et al.*, 166 Vt. 355, 694 A.2d 34 (1997).

The case of *Cooperative* is especially instructive. There, a claimant slipped and fell outside a restaurant that was insured by Cooperative. The attorney for the claimant sent a letter to Cooperative two months after the incident, but the insured restaurant did not provide formal

notice until some 18 months later.  The insured did not offer any excuse or reason for its delay.
Cooperative denied coverage for failure to notify.  A lawsuit arose.

In finding for the insured, the Supreme Court of Vermont noted some sage reasons that
would also apply here.  First, the insurance contract is one of adhesion.  The notice provision was
not freely negotiated between the parties.  *Id.*, 694 A.2d at 37.  The insurer placed the notice
requirement in the policy exclusively to its benefit.  *Id.*  The clause did take into account the
intentions or concerns of the policyholder.

Second, it is unfair for an insurance company to unilaterally deny the insured the very
thing that it has paid for, all on account of a provision that is not necessarily tied to its purpose.
*Id.*  "This is not to belittle the need for notice of an accident, but rather to put the subject in
perspective."  *Id.*

> It ". . . is an all or nothing proposition as it now is.  The present penalty now so far
> outreaches the purposes of the provision as to leave insureds subject to the
> withdrawal of protection for trivial reasons.  This is an invidious kind of forfeiture
> that can be damaging to both an unwary insured and an innocent insured."

*Id.*, 694 A.2d at 37-38.  The court then ruled that a "notice clause should not function  as a
technical escape hatch by which to deny coverage in the absence of prejudice . . . but rather as an
early warning mechanism to benefit both the insurer and insured."  *Id.,* 694 A.2d at 38 (citations
omitted).

Finally, the *Cooperative* court noted that although the question is usually one of fact for a
jury.  But where there is an absence of evidence from the insurance company that it would have
or could have proved that the loss was not covered, then summary judgment is warranted.  *Id.*  It
is not enough for an insurer to note that it **could have** produced some evidence at the time of the
event.  *Id.*

> Cooperative did not assert, however, that it had made any investigative effort to
> identify potential witnesses to the accident, that any particular witness was
> unavailable or had suffered memory loss, that any evidence had been lost or was

unavailable, or that it had actually made any significant investigation of the incident following notice of the claim. As the trial court noted, Czechut's letter to Cooperative's agent had provided a fair amount of detail concerning the incident, yet Cooperative offered no evidence that it had attempted to follow up on any of the information provided.

*Id.,* 694 A.2d at 39. And so it seems in this case here.

Like in *Cooperative,* the question in Nebraska is whether or not the insurer would have been meaningfully able to protect its interests in the matter if it had received timely notice. *Dutton-Lainson Co. v. Continental Ins. Co.*, 271 Neb. 810, 828, 716 N.W.2d 87, 102 (2006). The few cases in this state that address the issue generally find that the insurer was prejudiced if it was unable to intervene in a lawsuit or settlement with an injured third party. None of the cases are similar in fact or circumstances to the matter here. We can look to the law of other states, however, to get a better idea as to what would constitute actual proof of prejudice in a direct insurance loss claim.

Michigan law, for example, which follows the rules of Nebraska, does **not** require an insurer to prove that **but for** the delay it would have avoided liability. *West Bay Exploration, supra*, 915 F. 2d at 1030. It also allows summary judgment on this issue. *Id.*, (while the question of prejudice is generally to be left to the trier of fact, where the facts are so clear that one conclusion only is reasonably possible, the question is one of law.)

In *Hoechst, supra*, 684 N.E.2d 600 the court found that "bald assertion that witnesses have died, documents have been lost or destroyed, or opportunities have been lost is insufficient to show actual prejudice" to an insurer's position."

> If the function of the prejudice requirement is to protect the insurer's interests from being prejudiced, then the insurer must come forward with proof that it is interests were actually prejudiced; not speculation that its interests were "possibly" prejudiced. Accordingly, the insurer must identify "the precise manner in which its interests have suffered."

*Id.* at 608. *See also Canron Inc. v. Federal Ins. Co.*, 82 Wash. App. 480, 918 P.2d 937, 943 (1996)(where the court observed that an insurer's "lost opportunity" argument "would obviate the need to show actual prejudice" and therefore is contrary to state law which requires such proof).

**B.      MBRe Must Show A Material Harm From Late Notice.**

In determining whether an insurer's position has actually been prejudiced by the insured's untimely notice, other state courts also consider whether the delay has **materially** impaired the insurer's ability:  (1) to investigate liability and damage issues so as to protect its interests; (2) to evaluate, negotiate, defend, or settle a claim or suit; (3) to pursue claims against third parties; (4) to contest the liability of the insured to a third party; and (4) to contest its liability to its insured. *See Upjohn v. Aetna Cas. & Sur. Co.*, 768 F. Supp. 1186, 1205 (W.D. Mich. 1991) (reconciliation denied, 1994 U.S. Dist. LEXIS 11581) and *West Bay*, *supra*, 915 F.2d at 1036-1037.

An insurer must do more than simply claim that evidence was lost, physically altered, or has otherwise become unavailable and that witnesses have died, disappeared, or their memories have faded.  It must establish what is in fact lost by the missing evidence, how this prejudices its position, and why information available from other sources is inadequate. *See Kennedy v. Dashner*, 319 Mich. 491, 494, 30 N.W.2d 46 (1947)(where the court rejected the insurer's argument that its rights were prejudiced by a lost opportunity to investigate a claim and to adequately prepare a defense when the plaintiff's attorney had notified the defendant's insurer about an accident shortly after it had occurred and "an inquiry at the local police department would have disclosed considerable information with respect to the claim"); *Christopher v. Hartford Ins. Group, Inc.*, 1992 U.S. Dist. LEXIS 21640, slip op. 6-7 (E.D. Mich. 1992)(where the court, applying Michigan law, rejected the insurers' arguments that the insured's pre-notice

litigation efforts and the state's substantial pre-notice clean-up efforts at the site prejudiced their ability to investigate liability and damage issues because the insurers had not offered any specifics as to how any litigation decisions had prejudiced them and, furthermore, had not "shown that the delay in notice caused a loss of investigatory/documentary evidence relating to the condition of the facility at the time of clean-up, or that any loss of such evidence has made it impossible for them to make an adequate investigation as to the facility and its hazardous waste problems"); and *United Technologies Corp. v. American Home Assur. Co.*, 989 F. Supp. 128, 141 (D. Conn. 1997)(where the court observed that "for purposes of summary judgment, it is not sufficient for [the insurer] to merely state it was prejudiced without specifically identifying how it was prejudiced and articulating with greater precision why [the insured's] documentation is insufficient to cure such prejudice").

> As one court recently observed:

> Delayed notice which interferes with an insurer's ability to evaluate or investigate, as to coverage defenses or as to liability, may indeed cause actual prejudice. Lost witnesses or documents, or changes to the physical site, may affect the ability to investigate. However, prejudice will not ordinarily be presumed; what is lost or changed must be material, and not otherwise available or subject to reasonable reconstruction. Claims of prejudice require affirmative proof. . . . It is not sufficient merely to allege prejudice; an insurer must demonstrate specifics.

> **To establish actual prejudice resulting from delayed notice, an insurer must adduce affirmative proof of an advantage lost or disadvantage suffered as a result of the delay, which has an identifiable detrimental effect on the insurer's ability to evaluate or present its defenses to coverage or liability.** In the absence of such evidence, the jury's verdict was not supported by substantial evidence, and must be reversed.

*Canron v. Fed. Ins. Co.*, 918 P.2d 937, 943 (Wash. Ct App. 1996).

C.   **MBRe's Admission Of Coverage Obviates Proof Of Prejudice.**

Reeling back to review the facts presented in this case, it is hard to imagine how MBRe was materially prejudiced. A relatively insignificant time, five months at the most, had passed between the actual dates of loss and the insurer's discovery that the broker had not informed it of the incidents. *Cf. Gerrard Realty Corp. v. American States Ins. Co.*, 89 Wisc.2d 130, 277 N.W.2d 863 (1979) (*cited* by *Herman Bros.* as an example where 22 months delay could be prejudicial because suit had commenced.) And when the insurer did investigate the losses in December of 2008, it concluded that there was coverage for all three based upon its investigation. MBRe's investigator, Pazdera, was the eyes and ears of MBRe for the purposes of determining coverage through his research at the packing plant. He not only found from the facts of his investigation that there was coverage, he was conspicuously silent on any facts which might prove prejudice. He did not assert at that time that there was insufficient evidence of causation or a lack of information on the losses. Thus, MBRe's admission must be taken at its face value that when it did investigate, it was able to adequately determine coverage. In light of this admission, it seems impossible for MBRe to prove as a matter of law that it suffered actual and material harm.

## CONCLUSION

This case is ripe for a decision on both of NE Beef's allegations against MBRe. We addressed the bad faith claim first, because MBRe filed its own motion that deserved a thorough response. A review of the unchallenged facts and reasonable inferences that NE Beef presented in this brief here shows that not only has NE Beef met the thresholds of proof for summary judgment in stating a claim for a jury, but it has also met those thresholds of proof on bad faith as a matter of law. The Court here can rule summarily on this claim without further discovery.

As to its breach of contract claim, it was necessary to discuss those same issues and facts again to show that this claim was likewise ripe. The overlap is understandable when considering the nature of bad faith. Since it involves the reasonableness of coverage denial, the repetition cannot be avoided. Nonetheless, we can see again that only the law needs to be applied in this contract claim. So it, too, can be decided as a matter of law.

On the whole, what we have here is an insurer who is trying to avoid a multi-million dollar claim using any excuse available at the expense of its insured. We know from the voluminous case law on breach of contract and bad faith claims cited in this brief that insurers resort to such red herrings when they do not want to summon the courage to accord their policyholders the benefit of its insurance bargain. Of course the insurer's interests here are adverse and adversarial to NE Beef's! The claim is very large in this case. As a result case law cited herein tells us that such tension can be presumed. Insurers also know that by filing suit against their insureds on a large claim that there is a chance in the course of litigation that the vagaries may favor their rhetoric or policy interpretation. Or they hope that insureds will grow weary of the time, expense and energy zapped by litigation and may ultimately agree to settle for less than the full amount of the claim. *Bailey*, *supra*. So litigation can sometimes have its rewards for insurers who drag their policyholders into court. It was for those very reasons that the concept of bad faith arose – to hold insurers accountable for their actions when there appears no justifiable reason for rejecting coverage. *See Braesh*, *supra*; *see also* Neb. Rev. Stat. § 44-1540.

We must be mindful of the case law cited herein that defines "justifiable." It is not enough to have any defense to coverage, but rather it must be a **viable** defense. The insurer must take into account Nebraska law and the facts of the case. Here we have an insurer who investigated the three claims six months after they occurred. It determined there was coverage at

41

that time.  Any reason now for contradicting this admission must be rejected.  It smacks of

revisionism.  MBRe must be bound by its findings **then**, not its arguments **now**.  To allow them

to present evidence of additional prejudice in response to this motion, or to hear arguments that

their coverage rejection now is justified - especially when their reports in December or 2008 did

not indicate any prejudice or coverage issues at that time - can be seen as tacit approval of

MBRe's manipulation of these claims.

Likewise insurers must be challenged to take responsibility for the agreements that they

make in this state.  MBRe's pattern in this case of discarding its own contract language found in

Form 100-1, which it wrote and distributed with its policy to its insureds, is inexplicable; unless

we are to presume that this was an intentional act as a means to avoid coverage.  All the facts and

law point to this Form 100-1 as the controlling language in this insurance contract.  MBRe

drafted it, distributed it, and now is ignoring it when presented with proof that NE Beef adhered

to it.  Case law also states that Form 100-1 controls over the more general provision on notice

buried within the policy.  And even if it did not control, it creates an ambiguity then between the

two notice provisions in this contract that case law says must be resolved in NE Beef's favor.  So

again we see that MBRe has no argument as a matter of law or fact that NE Beef breached this

contract of indemnity.

Finally we must not overlook those general abiding principles of equity and fairness that

are incorporated into every insurance contract written in Nebraska.[6]  Certainly it is unfortunate

that MBRe did not ultimately receive notice of the three losses, even though NE Beef provided it

under the terms of the contract.  But between the two parties here, only one has unclean hands

from handling this matter.  Insurance contracts are ones of adhesion, giving all the power to the

---

[6]     *See Blue Cross & Blue Shield, Inc. v. Dailey,* 268 Neb. 733, 687 N.W.2d 689, 2004 Neb. LEXIS 171 (2004);
and *Central Granaries Co. v. Nebraska Lumberman's Mut. Ins. Ass'n,* 106 Neb. 80, 85, 182 N.W. 582 (1921)(an
insurance company is governed by the principles of equity and law as all other corporations or individuals having
the power to make contracts in this state).

insurer without taking into account the concerns of the policyholder.  This insurer drafted the contract and issued it to NE Beef.  Because it had all the control over its own language, it should be bound by its word choices on how to provide notice.  Likewise NE Beef paid its premiums for electrical breakdown coverage.  MBRe is trying to deny it the very thing it has paid for by contorting the language it drafted and ignoring its own investigations.  When the research by Pazdera did not pan out as MBRe had hoped, it began a second "investigation" to transcribe the opinions of the NE Beef personnel and the broker to determine what they thought MBRe's notice provisions meant.  At the time MBRe undertook this process, it was already well aware that the broker was the culprit who did not forward the notices.  This second investigation was a red herring attempt to obfuscate the real issues of whether or not MBRe was actually prejudiced by the late notice.  *See* Neb. Rev. Stat. § 544-1540(7) and (8).[7]

As the *Cooperative* court noted *supra,* at page 35, this is the most "invidious" kind of behavior toward an insured who has paid for the benefit of his bargain.  When we take all MBRe's actions here into account, we can see a concerted pattern of behavior that other courts have found to be bad faith.  We can also see that NE Beef did not breach its contract.  It deserves the benefit of its bargain.  It should be granted judgment summarily here as a matter of law on both its claims.

WHEREFORE, for all these reasons NE Beef moves the Court to deny MBRe's partial motion for summary judgment, that it grant NE Beef's motion for summary judgment on both its bad faith and breach of contract claim, that it dismiss MBRE's declaratory judgment action with

---

[7]   Neb. Rev. Stat. § 44-1740(7) and (8) states:  **Unfair claims settlement practice; conduct prohibited.**  Any of the following acts or practices by an insurer, if committed in violation of Section 44-1539, shall be an unfair claims settlement practice:

* * *

(7)  Refusing to pay claims without conducting a reasonable investigation;

(8)  Failing to affirm or deny coverage of a claim within a reasonable time after having completed its investigation related to such a claim.

43

prejudice; that it set a date for trial of the damages incurred in this case, and for further relief as the Court deems just and proper.

Respectfully submitted:

NEBRASKA BEEF, INC. and SOUTH OMAHA
INVESTORS PACK, L.L.C., Defendants,

By:    /s/ Anne Marie O'Brien
             William M. Lamson, Jr., #12374
             Anne Marie O'Brien, #18271
             Lamson, Dugan and Murray, LLP
             10306 Regency Parkway Drive
             Omaha, NE 68114
             Telephone: (402) 397-7300
             Telefax: (402) 397-7824
             wlamson@ldmlaw.com
             aobrien@ldmlaw.com
             *ATTORNEYS FOR DEFENDANTS*

## CERTIFICATE OF SERVICE

I hereby certify that on this __18th__ day of December 2009, I caused the foregoing brief to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

Russell E. Yates
Dart M. Winkler
YATES LAW FIRM, LLC
1900 Wazee Street, Suite 203
Denver, CO 80202

and further certify that the above document was sent to the following non-CM/ECF participants via regular United States mail, postage pre-paid:

None

/s/ Anne Marie O'Brien

467932

44